RECORD NOS. 13-4835(L), 13-4836, 13-4837, 13-4839

In The

# United States Court Of Appeals
## For The Fourth Circuit

### UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

### KEITH WILLIE REED;
### STANLEY RAY WINSTON, a/k/a Stanley Wilson,
### a/k/a Rashaad Winston; ANTHONY CANNON;
### TOBIAS RICHARD DYER,

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

_____

### BRIEF OF APPELLANTS

_____

Lawrence H. Woodward, Jr.
SHUTTLEWORTH, RULOFF,
 SWAIN, HADDAD
 & MORECOCK, PC
4525 South Boulevard
Suite 300
Virginia Beach, VA  23452
(757) 671-6000

*Counsel for Appellant
 Keith Willie Reed*

Alfred L. Robertson, Jr.
ROBERTSON LAW OFFICE, PLLC
500 North Washington Street
Alexandria, VA  22314
(571) 482-5133

*Counsel for Appellant
 Anthony Cannon*

Melinda L. VanLowe
LAW OFFICE OF
 MELINDA L. VANLOWE
10476 Armstrong Street
Fairfax, VA  22030
(703) 865-5555

*Counsel for Appellant
 Stanley Ray Winston*

Abram J. Pafford
PAFFORD, LAWRENCE
 & CHILDRESS, PLLC
1100 Commerce Street
Lynchburg, VA  24504
(434) 528-6504

*Counsel for Appellant
 Tobias Richard Dyer*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................v

I.    SUBJECT MATTER AND APPELLATE JURISDICTION ........................1

II.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW AS TO ALL OF THE APPELLANTS ..............................................................3

III.  STATEMENT OF THE ISSUE PRESENTED FOR REVIEW AS TO APPELLANT TOBIAS DYER .............................................................3

IV.   STATEMENT OF THE CASE ............................................................3

    a.    Procedural History...................................................................3

    b.    Facts Relevant To The Issues Submitted for Review ...........................4

        i.    VVM, Inc. ....................................................................5

        ii.   Shoppers Food Warehouse ..........................................6

        iii.  Navy Federal Credit Union.........................................7

        iv.   DNA ...........................................................................9

        v.    Cellular Telephones and Historic Cellphone Data ..................10

V.    SUMMARY OF THE ARGUMENTS AS TO ALL APPELLANTS .........13

VI.   SUMMARY OF THE ARGUMENT AS TO TOBIAS DYER...................15

VII.  ARGUMENT AS TO ALL APPELLANTS .................................................15

    a.    Issue 1: The Trial Judge Abused His Discretion By Admitting Government's Exhibit 45 Into Evidence.............................................15

        i.    Standard of Review.................................................15

i

    ii.    Discussion of the Issue.............................................................16

            1.    Government's Exhibit 45 Is Irrelevant And The Government Failed To Properly Authenticate The Information Contained In The Exhibit ..........................16

            2.    The Trial Judge Erred By Admitting Exhibit 45 As Proof That Appellants Were Present At Each Robbery Location Where The Document Invaded the Province of the Jury To Determine Whether the Appellants Were Actually Present At Each Robbery Location And Agent Horan Could Only Testify To The Location Of The Telephones Analyzed, Not the Appellants.........................................23

b.    Issue 2: No Reasonable Trier of Fact Could Find Appellants Guilty Of the Offenses Detailed in the Second Superseding Indictment...........................................................................................29

    i.    The Government Did Not Present Sufficient Evidence That The Robbers Stole Property of VVM, Inc........................29

            1.    Standard of Review ......................................................29

            2.    Discussion of the Issue ................................................29

    ii.    The Government Did Not Present Evidence That The Guns Used In The Robberies Traveled Across State Lines...........................................................................................31

            1.    Standard of Review ......................................................31

            2.    Discussion of the Issue ................................................31

    iii.    The Evidence Did Not Identify The Appellants As Robbers Of The VVM, Inc., Shoppers Food Warehouse, and Navy Federal Credit Union, Beyond a Reasonable Doubt ...........................................................................................34

            1.    Standard of Review ......................................................34

2. Discussion of the Issue ...................................................34

    a. Stanley Winston ...................................................34

    b. Keith Willie Reed ...................................................39

    c. Tobias Dyer ...................................................42

        i. The VVM, Inc. Robbery ...........................43

        ii. The Shoppers Food Warehouse Robbery ...................................................48

        iii. The Navy Federal Credit Union Robbery ...................................................50

    d. Anthony Cannon...................................................54

        i. The VVM, Inc. Robbery ...........................54

        ii. The Shoppers Food Warehouse Robbery ...................................................57

        iii. The Navy Federal Credit Union Robbery ...................................................57

VIII. ARGUMENT AS TO TOBIAS DYER...................................................58

    a. Issue 1: The Trial Court Erred In Admitting A Cell Phone Purportedly Belonging To Tobias Dyer ...................................................58

        i. Standard of Review ...................................................58

        ii. Discussion of the Issue...................................................58

IX. CONCLUSION AND STATEMENT OF PRECISE RELIEF SOUGHT ...................................................61

X. REQUEST FOR ORAL ARGUMENT ...................................................61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

<u>**TABLE OF AUTHORITIES**</u>

**<u>Page(s)</u>**

<u>**Cases**</u>

*Burks v. United States*,
 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978) ...............................29, 31

*Glasser v. United States*,
 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1942) ..................................29, 31

*In re Japanese Elec Prds Anit Trust Litigation*,
 723 F.2d 238 (3d Cir 1985) ........................................................................16

*Keith Willie Reed, et al. v. United States*,
 Case Number 1:13-cr-48 (4th Cir. October 31, 2013).....................................1

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137, 119 S. Ct 1167, 143 L. Ed. 2d 238 (1999) ...........................21

*Maryland v. Craig*,
 497 U.S. 836 (1990).....................................................................................59

*O'Neal v. Morgan*,
 637 F.2d 846 (2d Cir 1980); *cert denied sub nom*
 *Esty v. O'Neal*,
 451 U.S. 972, 68 L. Ed. 2d 351, 101 S. Ct. 2050 (1981) ...........................16

*United States v. Alerre*,
 430 F.3d 681 (4th Cir. 2005) ...................................................................29, 31

*United States v. Arias*,
 678 F.2d 1202 (4th Cir. 1982) .................................................................48, 51

*United States v. Beidler*,
 110 F.3d 1064 (4th Cir. 1997) ................................................................29, 31

*United States v Bonner*,
 648 F.3d 209 (4th Cir. 2011) ...............................................................*passim*

*United States v. Burgos*,
   94 F.3d 849 (4th Cir. 1996) ............................................................29, 31

*United States v. Clay*,
   355 F.3d 1281, *cert. denied*,
   125 S. Ct. 626, 543 U.S. 999, 160 L. Ed. 2d 456 (2004) ........................ 32-33

*United States v. Gatlin*,
   613 F.3d 374 (3d Cir. 2010) ...........................................................32

*United States v. Hinton*,
   366 Fed. Appx. 481 (4th Cir. 2010)..................................................35

*United States v. Howe*,
   538 F.3d 842 (8th Cir. 2008) ........................................................32

*United States v. Forrest*,
   429 F.3d 73 (4th Cir 2005) ..........................................................15

*United States v. Foster*,
   507 F.3d 233 (4th Cir. 2007) ........................................................35

*United States v. Japanese Rifle*,
   571 F. Supp. 2d 685 (E.D. V.A. 2008)..................................................31

*United States v. Kittrell*,
   269 Fed. Appx. 338 (4th Cir. 2008)..................................................34

*United States v. Michael*,
   435 Fed. Appx. 243 (4th Cir. 2011)..................................................24

*United States v. Perez-Gonzalez*,
   445 F.3d 39 (1st Cir. 2006)..........................................................24

*United States v. Ray*,
   61 Fed. Appx. 37 (4th Cir. 2003)....................................... 47-48, 50

*United States v. Silker*,
   751 F.2d 477 (2d Cir 1984) ...........................................................16

*United States v. Spruill,*
119 F.3d 221 (4th Cir. 1997*), cert. denied,*
522 U.S. 1006 (1997)....................................................................34

*United States v. Summers,*
666 F.3d 192 (4th Cir. 2011) ....................................58, 59, 60

*United States v. Tran Trong Cuong,*
18 F.3d 1132 (4th Cir. 1994) ...............................................48, 51

*United States v. Vidacak,*
553 F.3d 344 (4th Cir 2008) ...................................................16

*United States v. Warren,*
593 F.3d 540 (7th Cir. 2010) ..................................................34

*United States v. Weaver,*
282 F.3d 302 (4th Cir 2002) ...............................................15, 16

*United States v. Wilford,*
2013 WL 2552446 (D. Md. 2013)....................................39, 56

*United States v. Williams,*
342 F.3d 350 (4th Cir. 2003) ...................................................29

*United States v. Williams,*
632 F.3d 129 (4th Cir. 2011) ...................................................58

**Constitutional Provision**

U.S. Const. amend. VI ...............................................................15, 59

**Statutes**

18 U.S.C. § 2 .......................................................................1, 3, 61

18 U.S.C. § 922(g)(1)...........................................................2, 3, 61

18 U.S.C. § 924(c)(1)(A) ......................................................2, 3, 61

vii

18 U.S.C. § 1951 ...............................................................................1, 3, 61

18 U.S.C. § 1951(a) ..........................................................................1, 3, 61

18 U.S.C. § 1951(b)(1) ..........................................................................30

18 U.S.C. § 2113(a) ..........................................................................1, 3, 61

18 U.S.C. § 2113(d) ...............................................................................3

28 U.S.C. § 1291 ....................................................................................2

## **Rules**

Fed. R. App. P. 4(b) ............................................................................2, 5

Fed. R. Crim. P. 29...............................................................................34

Fed. R. Evid. 401(b)..............................................................................17

Fed. R. Evid. 901 ..................................................................3, 15, 59, 61

Fed. R. Evid. 901(a)................................................................15, 17, 59

## **Other Authority**

7 Wigmore § 2129.................................................................................16

**TO THE HONORABLE JUDGES OF THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT:**

Your Appellants, Keith Willie Reed, Stanley Winston, Tobias Dyer, and Anthony Cannon, by counsel, represent that the Final Judgment Orders entered by the United States District Court for the Eastern District of Virginia in the case styled, *Keith Willie Reed, et al. v. United States*, Case Number 1:13-cr-48, on October 31, 2013, were entered in error, and that they are aggrieved by the decision of the trial court.

For the reason of uniformity herein, the Appellants will be referred to by their names or as "the Appellant" or "Appellants" and the Appellee shall be known as "the Government," as they were referred to by the trial court. The facts relevant to the issues on this appeal can be found in the Joint Appendix, which is cited herein as "(J.A.)"

## I.     SUBJECT MATTER AND APPELLATE JURISDICTION

Appellants Keith Willie Reed, Stanley Winston, Tobias Dyer and Anthony Cannon appeal the final judgment orders entered by the United States District Court for the Eastern District of Virginia finding them guilty of violating Title 18, Section 1951(a) of the United States Code Annotated, conspiracy to affect commerce by robbery, Title 18, Sections 2 and 1951, interference with commerce by robbery, Title 18, Sections 2 and 2113(a), armed robbery of a credit union, Title

1

18, Sections 2 and 924(c)(1)(A), using and carrying a firearm during and in relation to a crime of violence, and Title 18, Section 922(g)(1), possession of a firearm by a prohibited person.

Title 28, Section 1291 of the United States Code provides that the final judgment order of the trial court is reviewable by the court of appeals of the circuit in which the district court proceeding was held. The trial court entered a final judgment order on October 31, 2013, which was filed in the clerk's office of the United States District Court for the Eastern District of Virginia the same day and disposed of all parties' claims. On November 1, 2013, Mr. Winston, Mr. Dyer and Mr. Cannon filed timely Notices of Appeal in the trial court from the final judgments of the United States District Court for the Eastern District of Virginia, pursuant to Rule 4(b) of the Federal Rules of Appellate Procedure. Mr. Reed timely filed his Notice of Appeal on October 31, 2013.

On November 5, 2013, Mr. Dyer filed his Docketing Statement and Addendum with this Court. Mr. Winston filed his Docketing Statement and Addendum on November 22, 2013. Mr. Reed filed his Docketing Statement and Addendum with this Court on November 25, 2013. Mr. Cannon filed his Docketing Statement and Addendum with this Court on December 16, 2013.

## II.  STATEMENT OF THE ISSUES PRESENTED FOR REVIEW AS TO ALL OF THE APPELLANTS

**ISSUE 1:  THE TRIAL JUDGE ABUSED HIS DISCRETION BY ADMITTING GOVERNMENT'S EXHIBIT 45 INTO EVIDENCE.**

**ISSUE 2:  NO REASONABLE TRIER OF FACT COULD FIND APPELLANTS GUILTY OF THE OFFENSES DETAILED IN THE SECOND SUPERSEDING INDICTMENT.**

## III.  STATEMENT OF THE ISSUE PRESENTED FOR REVIEW AS TO APPELLANT TOBIAS DYER

**ISSUE 1:  THE TRIAL COURT ERRED IN ADMITTING A CELL PHONE PURPORTEDLY BELONGING TO TOBIAS DYER, WITHOUT REQUIRING PROPER AUTHENTICATION THUS VIOLATING FRE 901 AND DEPRIVING DYER OF HIS CONFRONTATION RIGHTS.**

## IV.  STATEMENT OF THE CASE

a.  <u>Procedural History</u>

On December 27, 2012, the Government filed a Criminal Complaint and supporting affidavit accusing Appellants of armed bank robbery in violation of Title 18, United States Code, Sections 2113(a) and (d).  On January 24, 2013, the grand jury returned an Indictment against Appellants for allegedly violating Title 18, Section 1951(a), conspiracy to affect commerce by robbery, Title 18, Sections 2 and 1951, interference with commerce by robbery, Title 18, Sections 2 and 2113(a), armed robbery of a credit union, Title 18, Sections 2 and 924(c)(1)(A), using and carrying a firearm during and in relation to a crime of violence, and Title 18, Section 922(g)(1) of the United States Code, possession of a firearm by a

3

prohibited person for robbery of a Navy Federal Credit Union in Arlington, Virginia. On March 12, 2013, the grand jury returned a superseding indictment alleging that the Appellants violated the same statutes related to a robbery at Shoppers Food Warehouse in Alexandria, Virginia and the Navy Federal Credit Union. Finally, on April 23, 2013, the grand jury returned a second superseding indictment alleging that the Appellants violated the same statutes related to a robbery at VVM, Inc., in Alexandria, Virginia, as well as the Shoppers Food Warehouse and Navy Federal Credit Union robberies.

Appellant Keith Willie Reed filed a pretrial motion to sever, which the Court denied. (J.A. 76). The parties appeared before the Honorable Claude M. Hilton on June 17, 2013 for a jury trial upon the charged offenses. On June 21, 2013, the jury found Appellants guilty of on all counts.

At the conclusion of the sentencing hearing, held on October 25, 2013, Judge Hilton sentenced Mr. Reed, Mr. Winston, Mr. Dyer and Mr. Cannon to sixty (60) months on each of Counts 1, 2, 3, 4, 5, and 10, to run concurrently with each other and consecutive with the sentence of sixty (60) months for Count 6, 300 months for Count 7 and 300 months for Count 8 for a total of 720 months or sixty (60) years of incarceration. On November 1, 2013, Mr. Winston, Mr. Dyer and Mr. Cannon filed timely Notices of Appeal in the trial court from the final judgments of the United States District Court for the Eastern District of Virginia,

4

pursuant to Rule 4(b) of the Federal Rules of Appellate Procedure. Mr. Reed timely filed his Notice of Appeal on October 31, 2013.

### b.    Facts Relevant To The Issues Submitted for Review

Three robberies occurred in Arlington and Alexandria, Virginia during December, 2012. The robberies took place at a commercial space located at 4810 Beauregard Street, Alexandria, VA 22312 with the words "VVM, Inc." on the door on December 7, 2012, Shoppers Food Warehouse on December 9, 2012, and Navy Federal Credit Union on December 22, 2012. The Government alleges that Appellants Stanley Winston, Anthony Cannon and Tobias Dyer robbed each establishment wearing masks and brandished firearms and took money while inside. Appellant Keith Willie Reed remained in the car out front to facilitate a quick getaway. (J.A. 35).

### i.    VVM, Inc.

Trial witness Jorge Vergara testified that he owned a silver Jeep Cherokee and last saw the vehicle parked outside of his house on Friday, December 6, 2012. (J.A. 588-589). The following day, on December 7, 2012, three (3) men robbed a commercial space located at 4810 Beauregard Street, Alexandria, VA 22312 with "VVM, Inc.," on the outer door. The government called trial witness Romedan Hassen to describe the robbery. Mr. Hassen first testified that he worked at "Abdul Communications, VVM, Inc.," which sells cellular phones and "we make a

payment for telephone bills and cigarettes and accessories for cell phone." (J.A. 555). He also testified that contained within the space is a check cashing establishment, for which he does not work. (J.A. 556).

Bystander Nana Donkoh testified at trial that he was in the building buying a telephone card when "I turn my back and somebody have a gun in my back. . . . He asked me to lay down. Then I lay down." (J.A. 574) He testified that two (2) men with a gun entered and then three (3) minutes later another person came in. (J.A. 574). Mr. Donkoh said two (2) of the men were taller than the third, and that he did not see the race of the robbers. Rather, over counsel's objection, Mr. Donkoh testified "so all of them I can hear from their voice that they are blacks." (J.A. 576). Counsel for Mr. Winston objected to the testimony as insufficient to be an identification. The government argued that it was Mr. Donkoh's "perception." Ultimately the court allowed the testimony, ruling that "[i]t goes to the weight of it." (J.A. 576).

Finally, Mr. Donkoh testified that he saw three (3) men jump into a Jeep and drive away but was not able to see a driver. (J.A. 577) No physical evidence linked Appellants to the stolen Jeep.

### ii.    Shoppers Food Warehouse

On December 9, 2012, a robbery occurred at the Shoppers Food Warehouse along Jefferson Davis Highway in Alexandria, Virginia. Lynette Jones, a

6

bookkeeper for the grocery store, testified that in the early morning hours of December 9, 2012, she saw two gentlemen standing by the door and one (1) took out a gun (J.A. 528-529). She could not see their face. (Id.) Latoya Freeman testified that while at the Shoppers Food Warehouse, she saw one (1) man climbing the wall and two other men standing below. The men were wearing face masks, black sweatshirts with hoods, and blue jeans. Finally, Ms. Jones testified, "I believe one of them might have had dreads or growing dreads because I saw the imprints on the – little cap." (J.A. 534). Counsel objected to this statement as speculative. The court overruled the objection. On cross examination Ms. Jones again testified, "[t]he imprint on the cap, you could tell they **might** have had dreadlocks." (J.A. 535). Eventually, however, Ms. Jones stated that she never saw the hair under the cap. (J.A. 536-537).

Finally, a black Jeep is seen on video outside of the Shoppers Food Warehouse. No witness saw the driver of the Jeep. No physical evidence linked Appellants to the stolen Jeep.

  iii. <u>Navy Federal Credit Union</u>

On December 22, 2012 at approximately 9:50 a.m., three (3) armed men robbed Navy Federal Credit Union in Arlington, Virginia and fled with money bags that contained three (3) GPS trackers. (J.A. 100, 128). One witness saw three (3) men leave the Credit Union and get into a black Jeep. (J.A. 63). Another

witness saw the driver of the jeep.  He is the only witness who ever saw a driver of the Jeep. He made a statement to the police on the day of the robbery and his description of the driver and what the driver was wearing did not describe Appellant Reed and what he was wearing that day.  (J.A. 798-800).

The GPS trackers inside the money bags led D.C. metropolitan police Officer Eldorado Mills to focus his attention on a residential area in D.C. Officer Mills observed four (4) black males, who were later identified as Appellants Reed, Winston, Dyer, and Cannon walking toward him from the side of a house in that area. (J.A. 183-184).   Officer Mills stopped the men about 2,000 feet from where he first saw them, got out of his car and asked for identification from the men. Appellant Reed made a motion for the three (3) Winston, Cannon and Dyer to follow him and they started running.  (J.A. 185-186).  The four (4) men ran into nearby woods where they were pursued by Officer Mills and other officers as he had requested backup. (J.A. 187).

Officer Harry Singleton responded to the request for backup.  When he arrived at the wooded area he saw Appellant Reed with a cell phone up to his ear and saw him drop several items behind a log. (J.A. 234).  As he approached Reed he noticed a ski mask or hat on the ground and when he arrived in Appellant's immediate area he saw a cell phone and some money on the ground.  (J.A. 235). He did not actually see anything leave Reed's hands or hit the ground. (J.A. 236).

Officer Elmo English also responded and searched Appellant Reed incident to his arrest. He found money and a screwdriver in Reed's pockets which he placed in a prisoner's property bag with Reed's name on it. (J.A. 241).

Later, Special Agent Luis Dejesus of the FBI responded to the wooded area to take custody of the evidence in the woods. (J.A. 250). From the woods he found and collected clothing items, four (4) masks, gloves, money and a cell phone. (J.A. 291). He put these items in an evidence bag and secured them in his trunk. (J.A. 294).

Another GPS signal came from a house near the woods. (J.A. 242). Officer Shaquinta Gaines was tasked to secure that home while the police obtained a search warrant. Approximately twenty (20) minutes after Officer Gaines arrived from the woods where she was helping with the arrest of the Appellants, a woman, later identified to be Reed's wife, Jade Taylor, approached her and asked if her husband had been arrested. (J.A. 246) Law enforcement conducted a search of this house, later determined to be Appellant Cannon's residence, and found $10,000.321 in cash and three (3) weapons. (J.A. 297-298).

      iv.    <u>DNA</u>

Susannah Kehl, a forensic examiner in the FBI's nuclear DNA unit, testified that nuclear DNA is individual and is found within the nucleus of a person's cell. It is unique to individuals with the exception of identical twins. Ms. Kehl examined

twenty-five (25) items and did not find any nuclear DNA from Mr. Winston on the items seized. Ms. Kehl testified that Appellant Reed was a major contributor of DNA found on one mask and a pair of gloves that was found during the search in the woods. (J.A. 419).

Constance Fisher is a biologist/forensic examiner in the mitochondrial DNA unit of the FBI laboratory division of the FBI. Ms. Fisher explained that a person has hundreds to thousands of copies of mitochondrial DNA per cell, which is passed from their mother. Ms. Fisher testified that a hair in one of the masks found in a trash can on 38th Street, S.E., Washington D.C., had the same mitochondrial DNA sequence as Stanley Winston. She could not conclude, however, that the hair found actually belonged to Mr. Winston. (J.A. 289, ll. 1-3). In fact, Ms. Fisher admitted that a Caucasian and Hispanic person could have the same mitochondrial DNA sequence as the hair analyzed. (J.A. 290, ll. 14-25; 291, ll. 1-10). The court admitted pictures of two other black males with dreadlocks that are not Stanley Winston. (J.A. 952, J.A. 953).

v.    <u>Cellular Telephones and Historic Cellphone Data</u>

Joseph Sierra testified as a custodian of the records from T-Mobile. He testified about records kept for telephone number (202) 594-4127. As the telephone is prepaid, no specific subscriber can be identified as the telephone's owner. (J.A. 363) Mr. Sierra also testified about historic cellphone data for use in

determining telephone location. While a person is sending a text message, according to Mr. Sierra, the location of the telephone cannot be determined.

When asked about recording a specific location, Mr. Sierra testified that at the outset of call, the cell tower location is recorded, not the actual location of the telephone. As Mr. Sierra testified, "it's not GPS." (J.A. 359, l. 4). He testified that each cell tower consists of different "bands." In population dense regions like Northern Virginia, the bands on a tower can become overloaded, causing the call to change bands within the same cell tower. If all bands on a particular tower are overloaded, the call will move to another cell tower. Mr. Sierra testified, therefore, that a call could ping off of a cell tower that is not the one closest to the originating telephone. In addition, Mr. Sierra testified that it is possible for a cell signal to be blocked by large objects, such as an office building. In that case, even though the telephone could be close in actual distance to that cell tower, a different cell tower, located at a greater distance from the telephone, would pick up the call signal. Mr. Sierra testified that a cell tower radius ranges from zero (0) to two and a half (2 ½) miles. One cell tower, therefore, could pick up a signal from a telephone that is two and a half miles away. (J.A. 363, ll. 22-25; 364, ll. 1-23). In fact, Mr. Sierra stated that "in an area like Alexandria and Washington, D.C., there are many towers. So you can stand in different locations of the same building and hit off of a different tower." (J.A. 238).

11

A records custodian for Sprint Nextel testified in response to a subpoena and provided call detail records for phone number (240) 355-8256, a prepaid Boost Mobile Handset. (J.A. 348, 374). There was no subscriber information available for the phone. (J.A. 374). The call records showed the phone that did the dialing, the called number, where the phone picked up and did the dialing, where the handset rang, where the call was routed, the start date and end date of the call, and the time and duration of the call, and the first cell and last cell tower and sectors that were utilized at the beginning and end of the call. (J.A. 368-370).

Richard Fennern, an FBI special agent trained in cellular phone analysis, used a Cellebrite device to extract data from a "Sanyo Boost Mobile phone" that was seized during an investigation of a robbery at the Navy Federal Credit Union on December 22. (J.A. 671). He stated that the number assigned to the Sanyo Boost phone was (240) 355-8256. (J.A. 673). From this phone he extracted data that included contacts, text messages, and incoming call lists. There was no testimony from Agent Fenneren to link this phone to any of the Appellants.

Special Agent Horan, an agent with the FBI Cellular Analysis Survey Team, ("CAST") testified as an expert in cell site record and call detail records (J.A. 703). There are three (3) relevant phones and four (4) relevant phone numbers in this case. Agent Horan prepared a diagram, admitted over several objections, as Government Exhibit 45, which allegedly illustrated, the location of the phones on

12

the days of the VVM, Inc., Shoppers Food Warehouse and Navy Federal Credit Union robberies based on his analysis of historic cellphone data. While Agent Horan testified several times that the diagram represented locations of the telephones at issue, he labeled each document with Appellants' names "Reed," "Winston," "Cannon," and "Dyer."

## V.    SUMMARY OF THE ARGUMENTS AS TO ALL APPELLANTS

### ISSUE 1

**The Trial Judge Abused His Discretion By Admitting Government's Exhibit 45 Into Evidence.**

Government's Exhibit 45 contains information that the Government did not properly authenticate, was not relevant to the issues presented at trial and invaded the province of the jury to determine whether the Appellants were actually present at each robbery. The trial court, therefore, abused his discretion by admitting the document into evidence over Appellants' objections. The government went through a series of questions supposedly designed to clarify that Exhibit 45 referred to the location of the Appellant's cellular telephones and not the Appellants. As the jury had to determine whether Appellants committed the robberies, a document detailing the location of the telephones associated with each Appellant is irrelevant.

In addition the government failed to establish that any of the Appellants actually possessed or owned the telephones seized by law enforcement, beyond a

13

reasonable doubt. Yet the Court admitted Exhibit 45 with the names of each Appellant rather than the telephone numbers. This invaded the province of the jury as it was their job to determine whether the government proved ownership of the phones as to each of the Appellants beyond a reasonable doubt and attribute the movement of the telephones as to each Appellant.

Finally, Exhibit 45 is not drawn to scale, making the distances between the locations depicted appear shorter than reality.

## ISSUE 2

**No Reasonable Trier of Fact Could Find Appellants Guilty Of the Offenses Detailed in the Second Superseding Indictment.**

The Government presented insufficient circumstantial evidence to allow a reasonable trier of fact to find Appellants guilty of all counts listed in the Second Superseding Indictment. The key issue before the jury was the identity of the individuals that robbed the VVM, Inc., Shoppers Food Warehouse and Navy Federal Credit Union. The Government presented scant eyewitness evidence of the identity of the robbers. The circumstantial evidence presented did not prove Appellants robbed the VVM, Inc., Shoppers Food Warehouse or Navy Federal Credit Union, beyond a reasonable doubt. The Government also failed to present evidence that the robbers stole property of VVM, Inc. and that the guns supposedly possessed by the Appellants traveled across state lines.

## VI.   SUMMARY OF THE ARGUMENT AS TO TOBIAS DYER

**ISSUE 1:   THE TRIAL COURT ERRED IN ADMITTING A CELL PHONE PURPORTEDLY BELONGING TO TOBIAS DYER, WITHOUT REQUIRING PROPER AUTHENTICATION THUS VIOLATING FRE 901 AND DEPRIVING DYER OF HIS CONFRONTATION RIGHTS.**

The trial court erred in allowing the Government to introduce a cell phone allegedly belonging to Tobias Dyer, because the Government never authenticated the phone as required by FRE 901(a).  This error also deprived Mr. Dyer of his confrontation rights under the Sixth Amendment's Confrontation Clause.  The absence of any evidence concerning the circumstances under which the phone was first obtained by the police reflect a failure on the part of the Government to satisfy the authentication requirement of FRE 901(a), and deprived Mr. Dyer of his confrontation rights.  The cell phone and testimony concerning its contents should have been deemed inadmissible, and the trial court's erroneous ruling prejudiced Mr. Dyer.

## VII.   ARGUMENT AS TO ALL APPELLANTS

### a.   Issue 1: The Trial Judge Abused His Discretion By Admitting Government's Exhibit 45 Into Evidence.

#### i.   *Standard of Review*

This Court reviews decisions to admit evidence for abuse of discretion. *United States v. Forrest*, 429 F.3d 73 (4th Cir 2005).  *United States v. Weaver*, 282 F.3d 302 (4th Cir 2002). Under such review, a ruling will be found harmless if the

court is able to conclude, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Weaver* at 314. The district court's role is to serve as gatekeeper in assessing whether the proponent has offered a prima facie case from which the jury could reasonably find that the evidence is authentic. *United States v. Vidacak*, 553 F.3d 344 (4th Cir 2008).

    ii.    *Discussion of the Issue*

        1.    *Government's Exhibit 45 Is Irrelevant And The Government Failed To Properly Authenticate The Information Contained In The Exhibit.*

The requirement that a given piece of evidence is what its proponent claims is an inherent logical necessity. Authentication is perhaps the purest example of a rule respecting relevance: evidence admitted as something can have no probative value unless that is what it really is. *United States v. Silker*, 751 F.2d 477 (2d Cir 1984); *Citing* 7 Wigmore section 2129; *O'Neal v. Morgan*, 637 F.2d 846, 850-51 (2d Cir 1980); *cert denied sub nom Esty v. O'Neal* 451 U.S. 972, 68 L. Ed. 2d 351, 101 S. Ct. 2050 (1981); *In re Japanese Elec Prds Anit Trust Litigation*, 723 F.2d 238, 284-85 (3d Cir 1985).

At trial, Special Agent Horan, a member of the FBI CAST, testified as an expert in historic cell phone analysis. There are four (4) cellular telephone numbers at issue in this case. Special Agent Horan assigned a phone number to

each Appellant and prepared a report, admitted as Government Exhibit 45, which purportedly showed Appellants' locations at the time of the robberies based on historic cell phone data.  Appellants objected to Agent Horan's testimony and Exhibit 45 as to relevance and because the Exhibit listed Appellants names and not telephone numbers, consistent with the evidence admitted.  (J.A. 583,584).  In addition, the maps were not to scale.

Under Federal Rules of Evidence 401(b), relevance, and 901(a), authentication, the Government's introduction of cell phone location evidence to prove Appellants location at the time of the VVM, Inc. and Shoppers Warehouse robberies was not relevant.  Exhibit 45 is not relevant as historic cellular telephone data does not provide an accurate location.  While the government tried to use historic cellular telephone data to establish the exact locations of the Appellants, the Government's own witness testified that the science is anything but exact.  Specially, Mr. Sierra of T-Mobile testified that at the outset of call, the cell tower location is recorded, **not the actual location of the telephone**.  As Mr. Sierra testified, "it's not GPS."  He testified that each cell tower consists of different "bands."  In population dense regions like Northern Virginia, the bands on a tower can become overloaded, causing the call to change bands within the same cell tower.  If all bands on a particular tower are overloaded, the call with move to another cell tower.  Mr. Sierra testified, therefore, that a call could ping off of a

17

cell tower that is not the one closest to the originating telephone. In addition, Mr. Sierra testified that it is possible for a cell signal to be blocked by large objects, such as an office building. In that case, even though the telephone would be close in actual distance to that cell tower, a different cell tower, located at a greater distance from the telephone would pick up the call signal. Mr. Sierra testified that a cell tower radius ranges from zero (0) to two and a half (2 ½) miles. A cell tower, therefore, could pick up a signal from a telephone that is two and a half (2 ½) miles away. In fact, Mr. Sierra stated that "in an area like Alexandria and Washington, D.C., there are many towers. So you can stand in different locations of the same building and hit off of a different tower." As historic cellular telephone data cannot establish an exact location, Exhibit 45 was not relevant and was actually more prejudicial than probative of the Appellants' locations at the time of each robbery.

In addition, the Government went out of its way to establish that Agent Horan was only testifying about the location of the telephones and not the location of the Appellants.

> Q.    Now, when you're plotting this information down, are you – or when you're performing a record analysis, are you determining the location of a particular person?
>
> A.    The only thing that I'm doing is I'm doing what's called geo-locating the cell phone. So it's – it's focused on the cell phone itself. **I just am trying to show where the phone was over a particular time. I don't know**

**<u>who actually had it, who was operating it, just where
it was over that period of time.</u>**

(J.A. 581, ll. 14-22) (emphasis added).   As the primary issue for the jury to

determine was the identity of the robbers, Agent Horan's testimony about the

locations cellular telephones was irrelevant unless the Government could prove

that Appellants possessed the phones during each of the robberies, which the

Government did not establish.

T-Mobile provided a pre-paid contract to operate the iPhone4, allegedly

owned by Stanley Winston.  T-Mobile did not have any subscriber information

providing that Mr. Winston owned the telephone.  Even if he did, however, for

Exhibit 45 to have any relevance, the Government had to prove that Mr. Winston

was in possession of the iPhone4 at the time of the robberies.  Without this

evidence, Agent Horan could testify to nothing more than the location of the

telephone.  Testimony that Mr. Winston was present at the robberies based upon

the location of the telephone is speculation.

Prior to Agent Horan's testimony, here is the evidence that the Government

introduced about appellant Reed and a cell phone:

(1)    After appellant was chased into the woods and before he was arrested

he was observed talking on a cell phone.  (J.A. 234).  As the officers came to arrest

him, they saw a blue cell phone on the ground.  (J.A. 235).   Reed did not have a

cell phone on his person when he was arrested

19

(2)     After the metropolitan police arrested appellant Reed and the other defendants and transported them away from the scene, the FBI took control and did a search of the woods and a blue cell phone was found. (J.A. 251, 253).  There was no evidence that the metropolitan police coordinated with the FBI as to where each defendant was arrested in the woods and where the cell phone found in the woods was in relation to where appellant Reed and the other defendants were arrested.

(3)     In response to a subpoena, a Sanyo evidence custodian retrieved the call records for phone number (240) 355-8256 (J.A. 367).     There was no subscriber information for the phone as it is a prepaid boost mobile phone.  (J.A. 373-374).   The phone records introduced by the Sprint agent only show the incoming and outgoing calls to that phone and there is no testimony that ties these incoming and outgoing phone calls to anyone.

(4)     FBI Special Agent Fenneran was able to download data from the phone found in woods including text messages, contacts and phone calls.  The whole of the testimony about that extraction revealed that MDN stands for Mobile Directory number.  (J.A. 674);  Government Exhibit 17-3 is text messages from the phone; the time of the text messages is Eastern time (J.A. 674);  and Government Exhibit 17-4 includes  text messages and incoming calls.  (J.A. 674). There was no testimony that connected any of these things with Appellant Reed.   This lack of evidence is especially illustrating when it is compared with other testimony both

20

by Fenneran and other agents about other phones at issue in this case that shows contacts, text messages, and pictures that makes these phones unique or identifies the other phones to the other Appellants. (J.A. 674, 676, 679).

The Government called Special Agent Horan to testify as an expert in cell phone analysis and through his testimony tried to authenticate the phones as belonging to the Appellants. "It is axiomatic that a party must lay a sufficient foundation before a jury is entitled to credit the opinion of an expert witness." *United States v Bonner*, 648 F.3d 209 (4th Cir. 2011). As it clear from his testimony, Agent Horan did not have the requisite knowledge to authenticate the phone. The trial judge in this case had a "special obligation" to ensure that expert testimony is relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct 1167, 143 L. Ed. 2d 238 (1999).

Agent Horan based his conclusion that the phone belonged to Reed because he was told it was taken from Reed at the time of his arrest, as it was with the case of Dyer and Winston, (J.A. 379, 380, 385, 388). That clearly contradicts the Government's evidence that the phone attributable to Appellant Reed was found by the FBI when they were doing a search of the woods sometime after appellant was arrested by D.C. metropolitan police officers. (J.A. 175, 177).

Agent Horan also testified about other ways he matches a phone to its user: information coming through the case agent or subscriber information or some other

means such as physical evidence or listening to testimony. (J.A. 587). None of those criteria apply to Appellants Reed or Winston as there was no subscriber information for the T-Mobile and Boost Mobile phones, (J.A. 270-271), no physical evidence, and no testimony that linked Reed or Winston to the phones. The Government had contact information, text messages and phone calls from the phones and did not produce anything to tie these phones to Reed and Winston. Basically, the expert testified that the phones belonged to Appellants because that was what he was told. (J.A. 589, 591, 592, 626). As Agent Horan admitted, he was given very little facts of the case, (J.A. 609), but based on this he still was able to testify that the phones were associated with Appellants.

The Government was not able to produce prima facie evidence from which the jury could conclude that the phones did in fact belong to the Appellants. The court, therefore, should not have admitted Exhibit 45 into evidence to prove Appellants' location on the day of the robberies based on the locations of the phones seized. It was more prejudicial than probative for the Government to put that names of the Appellants on the maps rather than using the telephone numbers as identification only.

Because Exhibit 45 is the ONLY evidence in the case to show the Appellants presence at the robberies, this error was not harmless.

22

2.    *The Trial Judge Erred By Admitting Exhibit 45 As Proof That Appellants Were Present At Each Robbery Location Where The Document Invaded the Province of the Jury To Determine Whether the Appellants Were Actually Present At Each Robbery Location And Agent Horan Could Only Testify To The Location Of The Telephones Analyzed, Not the Appellants.*

After a cover page that lists the time and place of each robbery, the next pages of Exhibit 45 have maps that purport to show each Appellant's location at the time of the robberies based on historic cell phone data. Agent Horan assigned a color to each of the Appellants. At the top of the chart is the date of each robbery and the name of each Appellant. The report does not list the phone numbers Agent Horan assigned to the Appellants, it only states their names. In addition, the maps are not to scale.

Agent Horan testified that cellular telephone analysis can tell a story as where a phone was over a particular period of time as every time it is used it creates a record of where it was used. (J.A. 568). He reiterated and emphasized several times that his analysis could only state the location of a phone, not where an individual's location at any given time (J.A. 581, 582, 589, 599, 608, 609). In spite of that testimony, the court allowed Exhibit 45 to go to the jury doing exactly what the expert said he could not do.

Using names instead of telephone numbers was error as it allowed the expert to make a factual finding reserved for the jury. Assuming *arguendo*, that the

23

Government presented prima facie evidence to tie the phones collected with the Appellants, that does not end the inquiry. It remains for the jury to make its own determination as the authenticity of the admitted evidence and the weight it feels the evidence should be given. *United States v. Perez-Gonzalez*, 445 F.3d 39 (1st Cir. 2006). A decision that a document is authentic and therefore admissible does not determine whether the evidence will be credited by a trier of fact. The factual determination of whether the evidence is that which the proponent claims is ultimately reserved for the jury. *United States v. Michael*, 435 Fed. Appx. 243 (4th Cir. 2011). By admitting Exhibit 45 to prove Appellants presence at the scene of the VVM, Inc., and Shoppers Food Warehouse robberies, the court made the determination that the phones belonged to Appellants instead of allowing the jury to make that determination.

Without Exhibit 45, the jury would not have enough evidence to pair the phones with Appellants. Instead, from the arresting D.C. metropolitan police officers they would have had testimony that Reed was talking on a cell phone before he was arrested. From the FBI agents they would have evidence that a cell phone was found somewhere in the woods. From the Sanyo evidence custodian, they would have had incoming and outgoing calls from that phone but no subscriber information. From Agent Fenneran, they would have testimony that

24

data was downloaded from the phone and admitted as government Exhibits 17-2, 17-3 and 17-4, but very little testimony explaining those exhibits.

The Government showed Agent Fenneran Exhibit 17-2 and asked to identify the document. He stated that Exhibit 17-2 is the report from the Cellebrite analysis of the phone. (J.A. 538). He then explained that MDN stands for "mobile directory number" and refers to the telephone number for that phone. (J.A. 538). The Government then showed Agent Fenneran Government Exhibit 17-3. He testified that it is also from the report, and depicts text messages from the phone and the time of the text messages in Eastern Standard Time. (J.A. 538). He then identified Government's Exhibit 17-4, which depicts text messages and incoming call lists. (J.A. 538). There is nothing in his testimony that ties Reed to this phone.

Government's Exhibits 17-2 to 17-4 are confusing without further explanation. Agent Fennern testified he downloaded data from a "Sanyo Boost Mobile phone," seized during the investigation of the Navy Federal Credit Union robbery on December 22. (J.A. 535). The first page of Exhibit 17-2 describes the phone examined as a Sanyo SCO 2700 "Juno." The word "Boost" is not in the report. This is in spite of the fact that the phone assigned to Reed is always referred to in testimony as a Sanyo Boost Mobile phone not a Sanyo Juno. (J.A. 271, 535, 536, 537, 540, 564, 644).

25

The rest of the Exhibit 17-2 is purportedly phone contacts for the phone number (240) 355-8256.  There are no contacts in the phone that are unique to Reed and show that it his phone.   Government Exhibit 17-3 lists text messages from (240) 355-8256.  There is not a single text message in Exhibit 17-3 that links the phone to Reed.  It should be noted that the last page of Exhibit 17-2 has an unknown mobile phone number listed on the top and then there is a heading "text messages."  Presumably, but without any explanation, it seems like this is the last page of contacts and the first page of text messages.  There is what one assumes is a text message that states "ohh dis is Keith."   However, there is no testimony explaining the significance of this text, who originated this text and who received it.  The only testimony about Exhibit 17-2 is the definition of "MDN" and the only explanation as to Exhibit 17-3 is that the time of the messages is Eastern Standard Time.   Exhibit 17-4 does not tie Reed to the phone.

If the jury had not already been told that the phone with the number (240) 355-8256 belonged to Reed, a review of the analysis of phone extraction records from the other Appellants would also have cast doubt on whether the phone with that number belonged to Reed.

The Government also presented analysis of the contents of two (2) other phones:  the phone with the number (202) 239-9022, linked to Dyer and the phone with number (202) 594-4127, linked to Winston.  Paul Lee performed an extraction

for the phone linked to Dyer and created a report, admitted as Government's Exhibit 19. The contact information on Dyer's phone for the phone number (240) 355-8256, purportedly the phone number for the phone linked to Reed, is "melo." Exhibit 19-1, the report of analysis of the phone linked to Winston shows that it never called the phone linked to Reed so there is no contact information or relevant text messages from this phone to the phone linked to Reed.

There was no testimony or explanation or evidence that identified unique contacts, text messages, pictures, or phone calls that tied the phone with the number (240) 355-8256, to Reed. All the jury would have had is that Reed was talking on a cell phone prior to being arrested, a blue cell phone was seen near him by D.C. police officers before he was arrested and the FBI found a blue cell phone in the woods. This is not enough evidence that the phone that was found in the woods was *his* phone.

This error was especially egregious given the fact that there were four (4) cell phone numbers at issue in this case. As one reads through the record of trial, it is very difficult to match the phones with the Appellants. Even Agent Horan at one point got mixed up as to which phone belonged to which individual. He, then looked at Government Exhibit 45, which summed it up for him. (J.A. 575).

Finally, the maps prepared by Agent Horan were not drawn to scale. While the trial court ruled, "I don't know that scale is important in this situation. We're

27

plotting who as around the robbery, may or may not have been around a robbery scene. Whether the thing is to scale or not, we're not building something that has dimensions to it," (J.A. 584, ll. 13-17), the Government did attempt to show that the robbers drove from one location to the next within a specific timeframe. The Government claimed that it was plausible for the Appellants to drive from Washington D.C. to Alexandria and Arlington within the length of time depicted in Exhibit 45. If Exhibit 45 is not drawn to scale, as in this case, the jury had no idea of the actual distance the Appellants would have to cover in the time depicted. The maps left the jury with the impression that the distance between the points where the Appellants allegedly started and the bank robbery locations, is closer than it is in reality.

Government Exhibit 45 is a summary of the Government's theory of the case, not the evidence presented at trial. The document is designed to direct the jury to a specific conclusion: Reed, Winston, Dyer and Cannon committed the VVM, Inc., Shoppers Food Warehouse and Navy Federal Credit Union robberies. For these reasons, the document is irrelevant, invades the province of the jury and, is therefore, inadmissible.

**b.** <u>**Issue 2: No Reasonable Trier of Fact Could Find Appellants Guilty Of the Offenses Detailed in the Second Superseding Indictment.**</u>

      i.     *The Government Did Not Present Sufficient Evidence That The Robbers Stole Property of VVM, Inc.*

      *1.    Standard of Review.*

When a defendant asserts a claim of insufficient evidence, the "verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S. Ct. 457, 86 L. Ed. 680 (1942). Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). "Reversal for insufficient evidence is reserved for the rare case 'where the prosecution's failure is clear.' " *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (citing *Burks v. United States*, 437 U.S. 1, 17, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978) ).

      *2.    Discussion of the Issue*

The Government failed to prove that the robbers stole property of VVM, Inc. "A Hobbs Act violation requires proof of two elements: (1) the underlying robbery or extortion crime, and (2) an effect on interstate commerce." *United States v. Williams*, 342 F.3d 350, 353 (4th Cir. 2003). The Hobbs Act defines robbery as "the

29

unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1) (2013).

The government presented witness Romedan Hassan, who testified that he sells prepaid phones and telephone cards. He also testified that he shares space with a check cashing establishment. (J.A. 464, l. 24-25). Margarita Damian testified that she works at a check cashing establishment, processes wire transfers and that she also performs services for Western Union. (J.A. 465, ll. 1-7) She also testified about another vendor who sold handbags and other accessories in the space. None of the witnesses, however, described VVM, Inc., the nature of the business or the corporate structure. This evidence was necessary as VVM, Inc., unlike Navy Federal Credit Union and Shoppers Food Warehouse, is not a readily identifiable business. While "VVM, Inc." appears on the door of the commercial space, the evidence did not identify what property contained in the building constituted property of VVM, Inc., beyond a reasonable doubt.

30

ii.    The Government Did Not Present Evidence That The Guns Used In The Robberies Traveled Across State Lines.

1.    Standard of Review.

When a defendant asserts a claim of insufficient evidence, the "verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S. Ct. 457, 86 L. Ed. 680 (1942). Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). "Reversal for insufficient evidence is reserved for the rare case 'where the prosecution's failure is clear.' " *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (citing *Burks v. United States*, 437 U.S. 1, 17, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978)).

2.    Discussion of the Issue

None of the evidence presented by the Government established that the guns used in each robbery traveled across state lines.  Courts have found evidence sufficient to confirm that the firearm in question travelled through interstate commerce.  *See United States v. Japanese Rifle*, 571 F. Supp. 2d 685 (E.D. V.A. 2008) (fact that all firearms subject to forfeiture were manufactured in Japan or Germany was sufficient to establish requisite interstate commerce nexus, for

31

purposes of statute prohibiting possession of a firearm by a convicted felon); *United States v. Howe*, 538 F.3d 842 (8th Cir. 2008) (sufficient evidence supported determination that .22 caliber pistol that defendant possessed traveled in interstate commerce, as required on a conviction for being a felon in possession of a firearm; government used picture of .22 caliber pistol as demonstrative evidence when it questioned several witnesses to establish that the pistol defendant possessed was, in fact, a .22 caliber pistol, and a special agent testified that the .22 caliber pistol portrayed in picture could not have been manufactured in forum state, and therefore would have had to have traveled in interstate commerce); *United States v. Gatlin*, 613 F.3d 374 (3d Cir. 2010) (evidence was sufficient to prove that the handgun found in defendant's possession in Delaware had traveled in interstate commerce, as required to support conviction for being a felon in possession of a firearm; the gun was marked with a "Miami, Florida" engraving and the manufacturer's name, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) database indicated that the gun had been purchased in Virginia, and evidence was presented that no handguns had been manufactured in Delaware in nearly 100 years; Evidence was sufficient to enable jury to rationally conclude that weapon seized in defendant's motel room was possessed in or affected interstate commerce so as to establish interstate commerce element of felon in possession of a firearm offense); *United States v. Clay*, 355 F.3d 1281, *cert. denied*, 125 S. Ct.

626, 543 U.S. 999, 160 L. Ed. 2d 456 (2004) (firearm, which was seized in Georgia, bore an imprint indicating that it had been manufactured in Connecticut, and there was neither an objection made nor a contrary argument made to the jury as to location of manufacturing company). The Government's case contained none of this type of evidence.

None of the VVM, Inc., witnesses described the guns used during the robbery. Latoya Freeman, a bystander present in the Shoppers Food Warehouse, described the robbers as having "silver" guns. While the government showed pictures of guns found in the house on 1501 38th Street, SE, Washington D.C., none of the evidence established that the robbers used the guns depicted. Finally, while it housed a distinctive magazine clip, the Government did not present evidence that the handgun allegedly held by Stanley Winston in the Navy Federal Credit Union robbery matched any of the hand guns found at 1501 38th Street. The Government, presented no evidence, therefore that the guns seized at the 1501 38th Street home had been used in any of the three (3) robberies or that they traveled across state lines.

iii.    *The Evidence Did Not Identify The Appellants As Robbers Of The VVM, Inc., Shoppers Food Warehouse, and Navy Federal Credit Union, Beyond a Reasonable Doubt.*

1.    *Standard of Review.*

When this court reviews a sufficiency of the evidence argument, it must only sustain a verdict where "there is substantial evidence, taking the view most favorable to the Government to support it." *United States v. Spruill*, 119 F.3d 221, 227 (4th Cir. 1997*), cert. denied*, 522 U.S. 1006 (1997).

At close of the government's case in chief, Appellants moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure and the judge denied that motion.

2.    *Discussion of the Issue*

a.    <u>Stanley Winston</u>

The Government failed to prove that Stanley Winston robbed the VVM, Inc., Shoppers Food Warehouse and Navy Federal Credit Union, beyond a reasonable doubt.   "While it is possible to convict a defendant solely on circumstantial evidence, in cases where the identity of the perpetrator is in dispute, usually there is some specific 'identity' evidence or uncontroverted physical evidence that links the defendant to the scene of the crime. *See, e.g., United States v. Warren*, 593 F.3d 540, 547 (7th Cir. 2010) (defendant was found in possession of stolen money); *United States v. Kittrell*, 269 Fed. Appx. 338, 342 (4th Cir. 2008)

34

(evidence included fingerprints, an in-court identification, and handwriting expert when DNA evidence was inconclusive); *United States v. Foster*, 507 F.3d 233, 245 (4th Cir. 2007), (evidence of identity included evidence of past attempts to kill victim, letters instructing defendant to kill victim, and a taped conversation in which defendant was confronted about murdering victim and did not deny it); *cf. United States v. Hinton*, 366 Fed. Appx. 481, 484 (4th Cir. 2010) (relying on eyewitness evidence to show that there was sufficient evidence to implicate defendant).

In *United States v. Bonner*, this Court found insufficient evidence to support the appellant's robbery conviction.  This Court found that "only very flimsy facts tie Bonner to the robbery. Notably we lack any physical description of the robbers from the victims."  Specifically, this Court opined, "[f]irst, there is a conspicuous absence of any contemporaneous "identity" evidence linking the defendant to the robbery. The government's entire case consists of four pieces of circumstantial evidence: (1) a hat with multiple DNA matches worn by Bonner was also worn by one of the robbers; (2) Bonner's wallet, discovered in the alleged getaway car; (3) phone records showing calls from Bonner's cell phone to Ms. Edmonds and Mr. Ruth the night after the robbery; and (4) a separate phone record showing a call from a nearby gas station to Ms. Edmonds."  648 F.3d 209, 214 (4th Cir. 2011).

As in the *Bonner* case, none of the witnesses from the VVM, Inc., robbery could describe the robbers. Latoya Freeman, a witness at Shoppers Food Warehouse testified that she saw three (3) men in masks and one (1) appeared to have dreadlocks, although she later admitted that she did not see the robber's hair as it was covered. Dimance Inn, a witness at the Navy Federal Credit Union testified in similar fashion about seeing a loose dreadlock under a robber's mask and hood. The Court, however, admitted several pictures of individuals holding large stacks of money, into evidence. At least two of the pictures presented contained images of black males, other than Stanley Winston, with dreadlocks, holding what appear to be large stacks of money. No reasonable trier of fact could distinguish Mr. Winston from the other individuals, beyond a reasonable doubt, based upon the vague eyewitness descriptions.

Knowing the inadequacy of the eyewitness testimony, the Government argued that evidence of mitochondrial DNA and historical cell phone data provide circumstantial evidence of Mr. Winston's presence at the robberies. The Government argued that one of the masks found contained mitochondrial DNA of an African American with the same sequence as Mr. Winston. The DNA evidence, however, does not establish Mr. Winston's presence at any of the robberies. In *Bonner*, this Court did not find DNA on a baseball cap sufficient circumstantial evidence to convict the appellant. Strikingly, despite claims otherwise, no credible

physical evidence indicates that Bonner was wearing the Yankees hat on the night of the robbery.  The government disagrees and argues that because Bonner's DNA was 'predominant,' it was reasonable for the jury to infer that he was wearing the hat on the night of the robbery.  However, the DNA expert testified that he could not conclude who last wore the hat based on the DNA despite the government's emphasis on the word 'predominant.' J.A. 320.  Any assumption that Bonner was the last wearer is an impermissible inference by the jury."  *Bonner*, at 648 F.3d 209, 214 (4th Cir. 2011).  This Court warned:

> [w]e must thus be particularly vigilant when the government, as in this case, asks us to rely on scientific evidence as the primary basis for upholding a conviction. Our commitment to scrutinizing such evidence counsels against crediting the government's assertions that the DNA evidence in this case supported a guilty verdict against Bonner.

> *Id.* at 215.

As a preliminary matter, the mask attributed to Mr. Winston was not found at the location of any of the robberies or in the Jeeps linked to each of the robberies; police found the mask in the garbage.  In addition, Constance Fisher, the government's expert on mitochondrial DNA, stated that, unlike nuclear DNA that is unique to a specific person, mitochondrial DNA is not identifying.  She went on to add that at least twelve (12) other people have the same mitochondrial DNA sequence found in the mask.  Ms. Fisher explained that anyone that can be traced

37

through Mr. Winston's maternal line can have the same mitochondrial DNA. When presented with Ms. Fisher's testimony, no reasonable trier of fact could determine that the DNA found in the mask belongs to Stanley Winston alone, beyond a reasonable doubt. Rather, Ms. Fisher's testimony makes such a conclusion impossible and creates reasonable doubt.

The Government also presented analysis of the historic cell phone data of the IPhone4 through Agent Kevin Horan and used this information to place Mr. Winston at two (2) of the three (3) robberies. First, the Government did not establish, beyond a reasonable doubt that Mr. Winston owned the IPhone4 seized or that he was in possession of the phone at the time of the VVM, Inc., and Navy Federal Credit Union robberies. The Government's own evidence established that the IPhone4 is a prepaid phone. The cellular telephone company providing service for the phone, T-Mobile, lacked any information about the owner of the telephone. Also, the Government offered no evidence that at the time of the VVM, Inc. and Navy Federal Credit Union robberies, Mr. Winston physically held the IPhone4 or that the phone was within his power to control.

Agent Horan testified that historic cell phone data can establish a person's location with specificity. He also testified, however, that Mr. Winston's telephone was not pinging near the Shoppers Food Warehouse at the time of the robbery. In addition, despite Agent Horan's claims of specificity, based on testimony of a

38

DEA agent, a court within the Fourth Circuit found that the longitude and latitude of a cell phone ping can locate a phone within a radius of three (3) to five thousand (5,000) meters or up to three (3) miles. *See United States v. Wilford*, 2013 WL 2552446 *4 (D. Md. 2013).

b.    Keith Willie Reed

The government's theory of the case was that appellant Reed was the getaway driver of the stolen jeeps used in the robberies and the actions of the co-conspirators who actually robbed the banks with the firearms were attributable to him because he was a part of the conspiracy. When the Government's evidence in the case against Reed is viewed, divorced from the evidence against the other appellants, even in the light most favorable to the Government, it is clear that the Government did not meet their burden of proving Reed's case.

The genesis of the case against Appellant Reed is when he was stopped by officer Mills after the robbery of the Navy Federal Credit Union. The robbery of the credit union happened at approximately 9:50 a.m. on the morning of 22 December 2014. The time line is not clear but sometime after that, around 1100, (J.A. 211, 476) Appellant Reed was walking down the street with the three other appellants, Winston, Dyer and Cannon and when he was asked for his I.D. by Officer Mills, he fled into the nearby woods. The judge did not give an immediate

flight instruction because Officer Mills and another officer followed the appellants for a while before they stopped them.

When Reed was arrested, he was found with a screwdriver in his pocket. The evidence introduced at trial was that the jeeps used in all the robberies were stolen and all had their ignition locks punched out.  (J.A. 378, 384, 397, 403, 406, 546-544, 548, 553, 586, 589).   There was no evidence that showed how the ignition locks were punched out or who actually stole the jeeps, just that they were used in the robberies.  This apparently was the relevance of the screwdriver.

The FBI did a search of the woods sometime after the arrest and found masks  and gloves.   An expert testified that Reed was a major contributor of DNA found on one of the masks and a pair of gloves.   The expert could not say if Reed was the main provider of the DNA, where the DNA was found on the mask – i.e. inside or outside the mask, or if he was the last person to have worn the mask. (J.A. 419, 429,-430, 435, 438).  All this evidence really shows is that at some point Reed touched a mask and gloves found in the woods on a windy day in December. (J.A. 251) There was no credible physical evidence That Reed was wearing the mask and gloves during the robbery.  *See United States v. Bonner*, 648 F.3d 209 (4th Cir 2011).

There was only one witness, in all three charged robberies who saw a driver of the getaway jeep.  This was after the Navy Federal Credit Union Robbery.  This

witness saw a man in black jeep honking the horn and saw people come out of the credit union and get into the jeep. (J.A. 796-797). He made a statement on 22 December describing the driver as wearing a black and white Arab like turban, having dreads and wearing a black jacket with red on it. (J.A. 758-760). Reed does not have dreads and when he was arrested he was not wearing a black and white arab like turban and was wearing a black jacket not a black jacket with red on it. (J.A. 186, 190, 200).

The next piece of evidence was that Reed's wife showed up at a house that turned out to be defendant Cannon's house where guns and money were found about twenty minutes after the arrest of Reed. There was no evidence showing where Reed and his wife lived in relation to the woods or to Cannon's house. The total of this evidence is that Reed's wife asked a police officer if her husband had been arrested. From this piece of evidence, the government made a gigantic leap and argued that when Reed was talking on a cell phone in the woods he was talking to his wife and was asking her to go to Cannon's house to remove evidence.

The Government then attempted to introduce evidence that tied the cell phone in the woods to appellant Reed. This evidence was that Reed was talking on a cell phone prior to being arrested, a cell phone was found in the woods after a search, this cell phone belonged to Reed because a special agent with the FBI tied

41

it to Reed based on assumptions that were untrue and unsubstantiated and then was allowed to put in a report stating the phone was his and that Reed himself was in the geographic locations of the VVM and Shoppers warehouse robberies. As previously set forth, the Court erred in admitting this evidence. The cell phone report is the ***only*** evidence against Reed for these two robberies.

There is not a single piece of physical evidence that puts Appellant Reed at any of the robberies or in the stolen jeep getaway cars. There is not a single eyewitness that puts Appellant Reed at any of the robberies or in the getaway car. There is only one witness who even could definitely say there even was a getaway driver and his description of the driver does not match the physical description of Reed or the clothes he was wearing. Where it is possible to convict a defendant solely on circumstantial evidence, in cases where the identity of the perpetrators is in dispute, usually there is some specific "identity" evidence or unconverted physical evidence that links the defendant to the scene of the crime. *United States v. Bonner*, 648 F.3d 209 (4th Cir. 2011).

c.    Tobias Dyer

The evidence against Mr. Dyer was insufficient as a matter of law. The Government's case against Mr. Dyer was built on what were essentially two layers of guilt by association. The first involved an attempt to implicate Mr. Dyer in a December 22, 2012 robbery of the Navy Federal Credit Union in Arlington,

42

Virginia, based on his having been confronted by police hours after the robbery in the company of other individuals whom the police also suspected of involvement in the crime. The second involved an attempt by the Government to enlist the jury in validating the Government's unsupported assumption that if Mr. Dyer was involved in the credit union robbery, he must also have participated in separate armed robberies on December 9 (at a Shoppers Food Warehouse in Arlington, Virginia) and on December 7 (at a commercial space with a sign labeled "VVM, Inc." in Alexandria, Virginia). Even when the record is viewed in the light most favorable to the Government, there is simply no evidence that could allow a reasonable juror to conclude beyond a reasonable doubt that Mr. Dyer participated in each of the three robberies at issue.

*i.      The VVM, Inc., Robbery*

Appellants' joint arguments above address the Government's failure to prove beyond a reasonable doubt that the December 7 robbery involved a theft of funds from VVM, as opposed to one of the other tenant entities of the multi-tenant commercial space where the robbery occurred. This generally applicable argument concerning the Government's failure of proof is mirrored by a specific failure to introduce any evidence to sufficient to establish that Mr. Dyer participated in the December 7 robbery.

The VVM robbery took place shortly after 8:00 p.m. on December 7. (J.A. 557-58). Footage of the robbery was captured on a security camera, but the perpetrators wore dark clothing and masks, and none of the Government's trial witnesses who were present at the scene identified Mr. Dyer as one of the perpetrators. Agent Horan of the FBI testified as the Government's cell phone expert, and he indicated that his analysis placed the cell phones that were allegedly associated with defendants Reed, Cannon, and Winston near the scene of the VVM robbery in the two-hour window prior to the robbery. (J.A. 725). With respect to the cell phone attributed to Mr. Dyer, Horan testified merely that at approximately 6:35 p.m. on December 7, ninety minutes before the robbery took place, Dyer's cell phone was somewhere in northern Virginia, several miles away from the robbery location. (J.A. 725-26).

Horan also testified that at approximately 20 minutes *after* the December 7 robbery in northern Virginia, his analysis of the cell tower records revealed that the phone associated with Mr. Dyer was somewhere on New York Avenue in Washington, D.C. (J.A. 759). This finding resulted in the following exchange during cross-examination by Mr. Dyer's trial counsel:

> Q.    Okay.   So on the December 7th section of your report, when the report reflects that there are no calls made by the phone linked to Mr. Dyer within 90 minutes before the robbery and 20 minutes after the robbery he's on New York Avenue in D.C., does that show that your

> analysis does not place his phone at the scene of the robbery at the time of the robbery?
>
> A.    Yeah.  I mean, his phone was not there.  I mean, the records clearly show it was not there.

(J.A. 759).

With no eyewitness identifying Mr. Dyer, no physical evidence tying him to the VVM robbery, and with cell phone records strongly suggesting that he was somewhere else when the VVM robbery took place, the Government was reduced to arguing pure guilt by association.  The Government suggested that any evidence tending to show Mr. Dyer's participation in the December 22 federal credit union robbery or the December 9 grocery store robbery should also be deemed to establish his involvement in the VVM robbery, on the ground that all three robberies involved the use of a stolen Jeep and the selection of target locations near interstates, allegedly in order to allow "a quick getaway."  (J.A. 823).

The fact that the VVM robbers stole a Jeep and that the robbery location was in proximity to a highway cannot possibly supply a basis upon which a reasonable juror could conclude beyond a reasonable doubt that Mr. Dyer was guilty of participating  in the December 7 VVM robbery.  Jeeps and highways are plentiful in a the densely populated region of northern Virginia and Washington, D.C., and the Government introduced no evidence to suggest that these aspects of the robberies at issue in this case somehow rendered then anomalous in comparison to

45

other robberies occurring in the same region over the same time period. And whatever tenuous connection the Government might have sought to establish through this argument moved the Government no closer to proving that an completely identical group of individuals was responsible for carrying out each robbery, much less that Mr. Dyer was in each instance, beyond a reasonable doubt, an active participant in the group.

Indeed, the Government's arguments in support of convicting Mr. Dyer on the VVM robbery rest on an even weaker evidentiary record than other records that this Court has held legally insufficient to sustain a conviction. For example, in *United States v. Bonner*, 648 F.3d 209 (4th Cir. 2011), the Government relied on several pieces of circumstantial evidence in an attempt to tie defendant Bonner to an armed robbery at a fast food restaurant. The *Bonner* court held that the evidence was legally insufficient to sustain the defendant's conviction for armed robbery, emphasizing that gaps in the evidence required the jury to engage in impermissible speculation. *See id.* at 215. The court emphasized "the conspicuous absence of any contemporaneous 'identity' evidence linking the defendant to the robbery." *Id.* at 214. In a striking parallel to the present case, the eyewitnesses to the robbery were not able to provide any description of the perpetrators other than that they were African-American males. *See id.* at 211. This absence of descriptive eyewitness testimony or other identity evidence highlighted the

46

weakness of the Government's case, and the court noted that "in cases where the identity of the perpetrator is in dispute, usually there is some specific 'identity' evidence or uncontroverted physical evidence that links the defendant to the scene of the crime." *Id.* at 214.

The evidence linking Mr. Dyer to the VVM robbery is even weaker than the evidence held legally insufficient in *Bonner*. Unlike in *Bonner*, police in the VVM case did not recover clothing bearing Mr. Dyer's DNA at or near the scene of the robbery. And although the alleged getaway vehicles were recovered in both cases, in *Bonner's* case there were items in the vehicle that tied the defendant to the vehicle, and the vehicle itself was registered in the name of the defendant's girlfriend. *See id.* at 212. Here, in contrast, there was not a shred of physical evidence to tie Mr. Dyer to the vehicle that was allegedly utilized in connection with the VVM robbery.

The bottom line is that there is virtually no evidence at all to show that Mr. Dyer participated in the VVM robbery, much less evidence that would allow a reasonable juror find Mr. Dyer's guilt beyond a reasonable doubt. The Government's attempt to infer guilt by association based on the alleged participation of other individuals acquainted with Mr. Dyer, or the occurrence of subsequent robberies also perpetrated by masked African-American robbers, fails as a matter of law. *See, e.g., United States v. Ray*, 61 Fed. Appx. 37, 46 & n.4 (4th

47

Cir. 2003) (reversing conviction where Government's theory rested on assumption that pre-existing familial and social relationships between defendant and other conspiracy members proved defendant's participation); *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1142 (4th Cir. 1994) (vacating convictions based upon insufficient evidence where Government relied solely on prescription records for patients who did not testify and summary of charts reviewed by medical expert, and emphasizing that "Such tactics invite a jury to find guilt by association or as a result of a pattern"); *United States v. Arias*, 678 F.2d 1202, 1207 (4th Cir. 1982) (reversing convictions for importation of marijuana where verdict was based solely on speculative inference that because Quaaludes were illegally imported by defendant, marijuana recovered in close physical proximity to Quaaludes must have been imported from outside United States as well).

### ii.    The Shoppers Food Warehouse Robbery

The Government's allegations concerning Mr. Dyer's alleged participation in the December 9 Shoppers Food Warehouse robbery (i.e. the grocery store robbery) suffered from the same deficiencies as the allegations relating to the VVM robbery.  If anything, the Government's evidence was even weaker, as the Government's expert admitted that his review of cell phone records did not reveal any activity that would place the phone attributed to Mr. Dyer anywhere near the scene of the grocery store robbery on the morning of December 9.  (J.A. 759-60).

Similarly, the eyewitnesses to the grocery store robbery did not offer a meaningful description of the masked perpetrators and did not identify Mr. Dyer as one of the perpetrators. Nor did the Government introduce any physical or testimonial evidence to tie Dyer to the scene of the robbery or to the vehicle that was allegedly utilized by the robbers.

Lacking any evidence of Mr. Dyer's participation in the grocery store robbery, the Government instead sought to tie him to the robbery proceeds, arguing that December 9 photos of Mr. Dyer holding an unknown quantity of cash, posted to a social media website, proved his guilt. (J.A. 821). There was no evidence to show that the cash held by Mr. Dyer in the photos actually came from the Shoppers Food Warehouse, as opposed to any one of hundreds of other possible licit or illicit sources (e.g., gainful employment, savings, gambling proceeds, the sale of narcotics, etc.).

Even the Government does not claim that it was unusual for an African-American male in the Washington, D.C. area to possess cash on December 9, 2012. The only way for the jury to conclude that the cash in the photos came from the grocery store robbery would be to engage in rank speculation that arbitrarily excluded all other possible sources for the money, and settled on the inculpatory inference the Government wished to draw. As a matter of law, this arbitrary analytical path is legally insufficient to sustain the jury's conviction of Mr. Dyer

49

on the counts relating to the December 9 grocery store robbery. *See, e.g., Bonner*, 648 F.3d at 215 (emphasizing that conviction could not rest on Government theory that lent equal support to a range of speculative inculpatory and exculpatory inferences); *Ray*, 61 Fed. Appx. at 49 ("[W]hile we recognize that the government's proof need not be so certain as to exclude all inferences of innocence, in a case where the government's overall evidence of guilt is so thin, the alternate hypotheses consistent with innocence become sufficiently strong that they must be deemed to install a reasonable doubt in our hypothetical reasonable juror.") (internal citation omitted).

### iii.    The Navy Federal Credit Union Robbery

The Government's evidence of Mr. Dyer's alleged participation in the December 22 federal credit union robbery in Arlington, Virginia, suffers from many of the same weaknesses that undermine the Government' other charges. Security camera footage revealed perpetrators wearing masks.  None of the eyewitnesses identified Mr. Dyer as one of the robbers.  There was no physical or forensic evidence discovered at the credit union to suggest Mr. Dyer had been present.  Nor was any such evidence discovered in the abandoned vehicle allegedly used in connection with the robbery.  The Government expert's review of cell phone records relating to the phone allegedly linked to Mr. Dyer did not reveal any

50

evidence that the phone was in the vicinity of Arlington, Virginia or the federal credit union at the time of the robbery. (J.A. 760).

Lacking any direct or circumstantial evidence to show that Mr. Dyer was anywhere near the credit union when the robbery took place, the Government again fell back on guilt by association. The Government in essence based its entire case against Mr. Dyer on a fact that no one disputes, which is that Mr. Dyer was found in the company of his co-defendants Cannon, Winston, and Reed in Southeast Washington, D.C. at approximately one hour after the credit union robbery. The authority discussed above, however, establishes that this type of proximity-based guilt by association theory is legally insufficient to establish a defendant's guilt beyond a reasonable doubt, particularly when it is unsupported by any direct or circumstantial evidence that would place the defendant at the scene of the crime, as opposed to merely placing the defendant at a separate location, at some point after the crime, in the company of other individuals who may or may not have participated in the crime. *See, e.g., Bonner*, 648 F.3d at 214; *Ray*, 61 Fed. Appx. at 46 & n.4; *Tran Trong Cuong*, 18 F.3d. at 1142; *Arias*, 678 F.2d at 1207.

The Government's attempt to bolster its case through fingerprint and DNA evidence found on certain items recovered in Washington, D.C. cannot salvage the legally insufficient record on which Mr. Dyer's conviction was based. The blue plastic bag disposed of on Pope Street had partial latent fingerprints belonging to

51

Mr. Dyer and Mr. Cannon.   (J.A. 467-68).   The Government's DNA expert testified that Mr. Dyer was a contributor to DNA found on one of the masks recovered at 1501 38th Street.  (J.A. 430-31, 446).

The foregoing DNA and fingerprint evidence may establish that Mr. Dyer had contact with the items in question, but that is a far cry from constituting proof beyond a reasonable doubt that Mr. Dyer participated in the federal credit union robbery.   This Court in *Bonner* confronted a similar argument from the Government where a hat with a mixture of DNA, including DNA from the defendant, was discovered near a dumpster in the alley behind the fast-food restaurant that had been robbed by two masked men.  648 F.3d at 213-14.  The *Bonner* court pointedly rejected the Government's attempt to build an armed robbery case on this isolated piece of evidence, holding that despite Bonner's DNA being the predominant DNA found on the hat, "no credible physical evidence indicates that Bonner was wearing the Yankees hat on the night of the robbery." *Id.* at 214.  The Court also emphasized that the presence of DNA from other individuals made it impossible for a jury to conclude beyond a reasonable doubt, without engaging in impermissible speculation, that Bonner was the last person to have worn the hat prior to it being dropped or discarded in the alley behind the store where the robbery took place.  *See id.* at 214-15.

Here, any inference that can be drawn from the mask is even weaker, because the mask with Mr. Dyer's DNA was not discovered at the scene of the robbery in Virginia, but rather miles away in Washington, D.C. The Government here is faced with the same unbridgeable gap it faced in *Bonner*, in that the presence of the mask in a trash can in Washington, D.C. does not constitute evidence that Dyer actually wore the mask on the day of the robbery. Moreover, the Government's expert testified that while Mr. Dyer's DNA was predominant, the mask also contained DNA from at least one individual, and perhaps multiple other individuals. (J.A. 430-31, 445-46). The Government's expert acknowledged that she could not tell when any of the DNA materials were deposited on the mask, and that the length or duration of time for which a person handled or came in contact with a particular item had no necessary correlation to the amount of DNA that a person might leave on the item. (J.A. 445-46). *Bonner's* holding is clear that in light of such limitations, the jury is forbidden from inferring that the predominant DNA contributor to a particular items of headgear is also the last person to have worn the headgear. *See* 648 F.3d at 214-15.

Finally, the presence of Mr. Dyer's latent fingerprints detected on the blue plastic bag proves nothing other than that he may have come in contact with the bag at some point in time. Notably, Mr. Cannon's fingerprints were also detected on the bag, and Mr. Dyer was not holding the bag when one of the other

defendants was witnessed disposing of it on Pope Street. The Government's fingerprint witness also admitted that with respect to a fingerprint left on a plastic bag, she had no way to tell whether the fingerprint might have been present before or after certain items were placed in the bag. (J.A. 473).

In light of the holding in *Bonner* and the other authorities cited above, there is no way that a reasonable juror could infer beyond a reasonable doubt that Mr. Dyer's latent fingerprints on a plastic bag discovered in Washington, D.C. somehow establish his active participation in an armed robbery that took place in Arlington, Virginia. Yet the Government offered little else in the way of evidence to prove Mr. Dyer's participation in the December 22 federal credit union robbery. On this sparse record, no reasonable juror could conclude beyond a reasonable doubt that Mr. Dyer participated in the December 22 robbery, and accordingly his conviction on charges arising from that robbery must be set aside.

d.    Anthony Cannon

Mr. Cannon adopts arguments made by the other Appellants regarding the sufficiency of the evidence and adds the following arguments:

i.    *The VVM, Inc., Robbery*

None of the Government's trial witnesses identified Mr. Cannon as one of the VVM robbers. In addition, the association of the phone number with Mr. Cannon fails to establish his involvement with any of the crimes alleged in the

54

Indictment.  The Government presented analysis of the historic cell phone data through Agent Horan and used this information to place Mr. Cannon at two (2) of the three (3) robberies (J.A. 702, 854)  The Government did not establish, beyond a reasonable doubt that Mr. Cannon owned or was responsible for, any of the phones analyzed. In fact, the Government's evidence contradicted itself. One of the phones allegedly used by one co-defendant purportedly identified a phone number for Mr. Cannon, and the Government used that number as a phone attributable to Mr. Cannon (J.A. page 721).  The Government used this number despite the knowledge that in other cell phones seized in this case, that number was listed in the contacts list as a phone number for an unidentified person named "Tobe" (J.A. 805). Yet, another co-defendant's phone identified a different number for Mr. Cannon, and that phone number was not included in the analysis conducted by Agent Horan (J.A. 931). There was no explanation as to why one phone number was Mr. Cannon's and the other was not. There was no explanation why the second number was not included in the analysis. The only explanation for the assignment of that number to Mr. Cannon was that it fit the Government's theory of the case.  There was no other evidence linking any phone in this case to Mr. Cannon - no proof that he possessed it, or used it. Further, when questioning another co-defendant at the time of arrest, the Government received evidence that Mr. Cannon did not have a cell phone.  (J.A. 480).

55

Agent Horan testified that historic cell phone data can establish a person's location with specificity. Despite Agent Horan's claims of specificity, based on testimony of a DEA agent, a court within the Fourth Circuit found that the longitude and latitude of a cell phone ping can locate a phone within a radius of three (3) to five thousand (5,000) meters or up to three (3) miles. See *United States v. Wilford*, 2013 WL 2552446 *4 (D. Md. 2013). Further, as noted *supra*, which particular tower a cell phone seeks signal from is not reliable indicator of the location of the phone. (J.A. 359).

Specifically to the VVM Robbery, no witness was able to identify any of the Defendants. The only evidence that links Mr. Cannon to this robbery were based on the speculation of the Government, based upon the unreliable evidence of the location of cell phones, and the similarities between this crime and the robberies of the Navy Federal Credit Union and the Shoppers Food Warehouse. These crimes are not similar to each other in several important aspects.

In the VVM robbery, the crime occurred in the late evening hours. Three (3) males entered the location, armed with guns. (J.A. 573). Besides completing a robbery, they went on to take personal property of a witness. (J.A. 577). They then left the business.

56

ii.    *The Shoppers Food Warehouse Robbery*

The Government's allegations concerning the Shoppers robbery indicate that the crime took place in the early morning hours. Again, three (3) men entered the store with guns. The guns, however, were described as being silver in color. (J.A. 535). No personal property was taken from the witnesses. The eyewitnesses to the grocery store robbery identify Cannon, nor did the Government introduce any physical or testimonial evidence tying Cannon to the scene of the robbery or to the Jeep.

iii.    *The Navy Federal Credit Union Robbery*

The Government's evidence stated that this robbery occurred during the morning hours. There were descriptions of the specific firearms that differed materially from the description of the firearms in the other robberies. Again, no witness was able to identify Mr. Cannon as being one of the perpetrators.

After the robbery, law enforcement traced the money stolen to Mr. Cannon's mother's home. The police then approach the Defendants as they are walking down the street from the home. There is no effort to immediately secure the home for future search, no effort to detain and question other in the home or identify others who may be present in the home. It wasn't until some point later that Agent Hess discovers that there were others present in the home. (J.A. 480). It is only because

57

the police find these Defendants when they arrive in the neighborhood that the effort to circumstantially link them to these robberies.

There is no reliable evidence that links Mr. Cannon to these robberies. The Government's case is based on impermissible speculation and conjecture and no reasonable jury could have convicted the Defendants on this evidence.

## VIII. ARGUMENT AS TO TOBIAS DYER

### a. Issue 1: The Trial Court Erred In Admitting A Cell Phone Purportedly Belonging To Tobias Dyer.

#### i. *Standard of Review.*

A trial court's evidentiary rulings are reviewed for abuse of discretion. *See United States v. Summers*, 666 F.3d 192, 197 (4th Cir. 2011). However, de novo review applies where an evidentiary ruling implicates the Confrontation Clause. *See id.* (citing *United States v. Williams*, 632 F.3d 129, 132 (4th Cir. 2011). This Court also reviews for abuse of discretion a trial court's determination that an evidentiary item's chain of custody has been sufficiently established. *See id.*

#### ii. *Discussion of the Issue*

FBI agent Marc Hess was the first Government witness to discuss the cell phone that purportedly belonged to Tobias Dyer. He testified that on December 22, after he arrived at a Washington, D.C. police station to assist in the investigation of the Navy Federal Credit Union bank robbery earlier that day, he took custody of a bag of items that he found in a room at the police station. (J.A.

476, 488). This bag was labeled with Mr. Dyer's name, and Agent Hess testified that other officers were present when he took custody of the bag. (J.A. 488).

Mr. Dyer's trial counsel objected, correctly noting that there had been no testimony whatsoever concerning where the bag came from, who collected the items that were in the bag, and where, when, and under what circumstances those items (including the cell phone) had been recovered. (J.A. 488). The trial court overruled this objection. (J.A. 488). Later in the trial, when trial counsel renewed this objection in response to additional testimony concerning the phone that allegedly belonged to Mr. Dyer, the trial court simply invoked what it assumed to be customary procedure, stating "They always take and book people when they take them to the police station and they put their possessions in a bag." (J.A. 655).

The trial court should have sustained Mr. Dyer's objections. This Court has recognized that an evidentiary gap of the sort that exists here, when it relates to an important piece of physical evidence, may result in a violation of the defendant's rights under the Sixth Amendment's Confrontation Clause. *See Summers*, 666 F.3d at 200-01. This is not surprising, insofar as "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

These same concerns are also reflected in the authentication requirement embodied in FRE 901. The FRE 901(a) authentication standard is not particularly

59

demanding, *see Summers*, 666 F.3d at 201, but the utter lack of authentication evidence here is beyond the outer of limit of anything previously approved by this Court. This is not merely a case where there is an identifiable beginning and end point for an item of physical evidence, with gaps in the middle. Instead, evidence concerning *the starting point* with respect to what was allegedly Mr. Dyer's cell phone is entirely absent; the only thing that can be gleaned from the trial record is that the phone appeared at the Sixth District police station in Washington, D.C., in a bag labeled with Mr. Dyer's name. Notably, Mr. Dyer's fingerprints were not found on the phone, and the Government conceded that the account associated with the phone was not in Mr. Dyer's name. (J.A. 868).

Was the phone recovered from Mr. Dyer's person at the time of his arrest? Was it found during a search of the woods where a number of other pieces of physical evidence were recovered? Was it found during the search of the house at 1501 38th Street? What were the circumstances under which it was discovered, and did these circumstances shed any light, one way or the other, on whether the phone belonged to Mr. Dyer or was in his exclusive possession, custody, and control? The jury could do nothing but speculate on these issues. The absence of any evidence concerning the source of the telephone left the jury in a position where it had no evidentiary record on which to rely in assessing the accuracy of the Government's contention that the phone indeed belonged to Mr. Dyer and had

60

been in his exclusive possession and control throughout December 2012. The Government's deficient authentication fell short of the proof required under FRE 901, the phone and testimony relating to its contents should have been excluded.

## IX.   CONCLUSION AND STATEMENT OF PRECISE RELIEF SOUGHT

The trial court erred in finding Appellants Keith Reed, Stanley Winston, Anthony Cannon and Tobias Dyer guilty of violating Title 18, Section 1951(a), conspiracy to affect commerce by robbery, Title 18, Sections 2 and 1951, interference with commerce by robbery, Title 18, Sections 2 and 2113(a), armed robbery of a credit union, Title 18, Sections 2 and 924(c)(1)(A), using and carrying a firearm during and in relation to a crime of violence, and Title 18, Section 922(g)(1) of the United States Code, possession of a firearm by a prohibited person.

For the reasons set forth above, Appellants respectfully requests that this Court vacate the jury verdict entered in the trial court and remand this case for dismissal of the Second Superseding Indictment or, in the alternative, for a new trial.

## X.   REQUEST FOR ORAL ARGUMENT

Appellants do _not_ waive oral argument and do desire to orally state the reasons their appeal should be granted, in person, to a panel of this Court.

Respectfully submitted,

Stanley Ray Winston,
By Counsel

THE LAW OFFICE OF MELINDA L. VANLOWE, PC

BY: _____/s/_____

    Melinda L. VanLowe, Esquire
    Virginia State Bar I.D. Number 51143
    10476 Armstrong Street
    Fairfax, VA 22030
    (703) 865-5555
    (703) 763-2372 (fax)
    melinda@vanlowelaw.com

Keith Willie Reed
By Counsel

SHUTTLEWORTH, RULOFF, SWAIN, HADDAD & MORECOCK, P.C.

BY: _____/s/_____

    Larry H. Woodward, Jr., Esquire
    Virginia State Bar I.D. Number 21756
    4525 South Boulevard, Suite 300
    Virginia Beach, Virginia   23452
    (757) 671-6000
    (757) 671-6004 (fax)
    lwoodward@srgslaw.com

Tobias Dyer
By Counsel

PAFFORD LAWRENCE & CHILDRESS PLLC

BY: _____/s/_____
        Abram J. Pafford, Esquire
        Virginia State Bar I.D. Number 79999
        1100 Commerce Street
        Lynchburg, VA 24504
        (434) 528-6504
        (434) 528-6509 (fax)
        apafford@pafflaw.com

Anthony Cannon
By Counsel

ROBERTSON LAW OFFICE, PLLC

BY: _____/s/_____
        Alfred L. "Rob" Robertson, Jr., Esquire
        Virginia State Bar I.D. Number 45000
        500 N. Washington St.
        Alexandria, VA 22314
        (571) 482-5133
        (703) 842-6196 (fax)
        rob@robertsonlawoffice.com

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
**Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.  This brief does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>14,814</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

<u>/s/ Larry H. Woodward, Jr.</u>
Larry H. Woodward, Jr.

*Counsel for Appellant*
  *Keith Willie Reed*

<u>/s/ Alfred L. "Rob" Robertson, Jr.</u>
Alfred L. "Rob" Robertson, Jr.

*Counsel for Appellant*
  *Anthony Cannon*

<u>/s/ Melinda L. VanLowe</u>
Melinda L. VanLowe

*Counsel for Appellant*
  *Stanley Ray Winston*

<u>/s/ Abram J. Pafford</u>
Abram J. Pafford

*Counsel for Appellant*
  *Tobias Richard Dyer*

Dated: May 7, 2014

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 7, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Rebecca H. Bellows
Patricia T. Giles
OFFICE OF THE
  UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3748

*Counsel for Appellee*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Adrienne R. Acra-Passehl
Adrienne R. Acra-Passehl
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street
Suite 230
Richmond, VA  23219